UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

PAUL HANSMEIER,

     Plaintiff,

0:20-cv-1315 (NEB/LIB)

v.

MEMORANDUM IN SUPPORT OF MOTION
FOR A PRELIMINARY INJUNCTION

WILLIAM BARR; and ERICA
MACDONALD,

     Defendants.

Dated: July 9, 2020

Paul Hansmeier
20953-091 Unit K3
Federal Correctional Institution
P.O. Box 1000
Sandstone, MN 55072

RECEIVED
BY MAIL
JUL 13 2020
CLERK
U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

SCANNED
JUL 13 2020
U.S. DISTRICT COURT MPLS

-1-

# I. Introduction.

Paul Hansmeier plans to help people with disabilities enforce their rights under the Americans With Disabilities Act ("ADA"). He cannot do so, however, without facing a credible risk of criminal prosecution. This credible risk of criminal prosecution arises in part from the conviction obtained by the government in _United States v. Hansmeier_, 16-cr-334 (JNE/KMM) (D. Minn.).

In _Hansmeier_, the government charged Hansmeier with mail and wire fraud based in part on allegations that Hansmeier helped copyright holders enforce their rights under the Copyright Act. According to the government, Hansmeier helped bring claims that were frivolous because Hansmeier instructed an investigator to present copyrighted works to users of a notorious digital piracy website—only to turn around and sue them when they pirated the works. This alleged "frivolousness" made virtually everything Hansmeier did (or did not do) in the cases "fraudulent," according to the indictment.

The unusual thing about Hansmeier, and the reason why Hansmeier gives rise to a credible risk of criminal prosecution here, is that the government had no basis for claiming that Hansmeier's use of an undercover investigator vitiated subsequent copyright infringement claims. See Capitol Records, Inc. v. Thomas, 579 F. Supp. 2d 1210, 1216 (D. Minn. 2008) ("Eighth Circuit precedent clearly approves of the use by investigators by copyright owners.") (citing Olan Mills, Inc. v. Linn Photo Co., 23 F.3d 1345 (8th Cir. 1994)). If the Eighth Circuit affirms in Hansmeier, then a partisipant in a judicial proceeding is vulnerable to mail and wire fraud charges whenever an officer of the executive branch disapproves of a position taken by that participant — even when that position is directly supported by circuit or Supreme Court precedent. A prospective litigant who has reason to believe that an officer of the executive branch will disapprove of anticipated claims has no realistic choice but to seek an injunction against the executive branch before proceeding with the claim.

-3-

Hansmeier has strong reason to believe that Defendants disapprove of the ADA enforcement methods described herein. These reasons include: (1) Defendants threatened Hansmeier with criminal prosecution for helping people with disabilities enforce their rights under the ADA; and (2) Defendants frivolously described Hansmeier as a threat to public safety based on his helping people with disabilities enforce their rights under the ADA.

Hansmeier thus seeks an order from this Court preventing Defendants from engaging in an unconstitutional overreach. Hansmeier also seeks an order addressing Defendants' violations of the ADA's participation clause. In broad brush strokes, the ADA prohibits retaliation against people who help others enforce their rights under the ADA. As will be detailed more specifically herein, Defendants have unlawfully retaliated against Hansmeier for helping people with disabilities enforce their rights under the ADA and can be expected to do so in the future unless they are enjoined by the Court.

-4-

In this motion for a preliminary injunction, Hansmeier asks the Court for

two forms of preliminary relief: First, Hansmeier asks the Court to preliminarily

enjoin Defendants from applying the mail fraud, wire fraud and extortion statutes[*] to

Hansmeier (or anyone assisting him) for helping people with disabilities enforce their rights

under the ADA via the "tester" method. Second, Hansmeier asks the Court to

preliminarily address Defendants' unlawful retaliation by ordering Defendants to

transfer Hansmeier to home confinement pending the conclusion of this case and

by preliminarily enjoining Defendants from taking adverse action against Hansmeier

based on his assisting people with disabilities enforce their rights under the ADA.

## III. Argument.

As a plaintiff seeking a preliminary injunction, Hansmeier bears the burden

of showing: (1) that he is likely to succeed on the merits; (2) that he is likely

to suffer irreparable harm in the absence of an injunction; (3) that the balance

[*] 18 U.S.C. §§ 1341, 1343 and 1951, respectively.

-5-

of equities tip in his favor; and (4) that an injunction is in the public interest.

See Watkins Inc. v. Lewis, 346 F.3d 841 (8th Cir. 2003). Since this case

involves the government, the balance of equities factor merges with the fourth factor,

public interest. Nken v. Holder, 556 U.S. 418, 435 (2009).

A. The Court should enter a preliminary injunction with respect to Hansmeier's Constitutional claims.

Hansmeier readily satisfies the requirements of standing and meets his burden

on the merits for obtaining a preliminary injunction against Defendants' application of to the

mail fraud, wire fraud and extortion statutes to Hansmeier (or anyone assisting him)

for assisting people with disabilities enforce their rights under the ADA.

1. Background.

From 2014 - 2016, Hansmeier represented people with disabilities

in bringing claims under Titles II and III of the Americans With Disabilities Act

against privately-owned businesses and local governments. In the typical case

Hansmeier's clients alleged that the defendant(s)' premises were associated with discriminatory architectural barriers (e.g., a step at the front enterance that is impassable by someone who uses a mobility device, a parking lot without any accessible parking spaces or a business with no accessible bathrooms). The point of the cases was that Hansmeier's clients could not use these businesses unless they found someone to help them — and in some instances not even the assistance of third parties would provide a meaningful level of access to the facility. The harm flowing from illegal architectural barriers is that they exclude affected people from participation in society. Until recently, for example, the federal courthouses in Fergus Falls and Duluth lacked accessible bathrooms. This means that people who require an accessible bathroom (often times, people who use mobility devices) were excluded from public access to or, practically speaking, employment by the court.

The typical case brought by Hansmeier's clients settled for a

for a combination of barrier removal and money. Most cases settled, but some

did not. To his knowledge, Hansmeier is the only attorney in recent history to

take an architectural barrier case to trial, prevail and defend the judgment

on appeal. Hansmeier's clients' claims were subjected to the crucible of the

adversary process — and succeeded.

The success of Hansmeier's clients' cases sparked a wave of voluntary

ADA compliance at businesses across Minnesota generally and in Hennepin County

specifically. Put bluntly, businesses decided to voluntarily comply with the ADA

rather than face the much costlier proposition of getting sued for violating the ADA

and being forced to comply with the ADA anyways. At the height of this wave

the U.S. Attorney for the District of Minnesota stopped the positive momentum

in its tracks by charging Hansmeier with mail and wire fraud for the copyright

enforcement actions described in the Introduction, supra. These charges sapped

all of the energy out of Hansmeier's clients' cases to the point where the

business community reverted back to its historic indifference to ADA compliance.

As an example of this current apathy, in 2018 Hansmeier approached a Chamber of Commerce

to offer to provide free "access incident" reports of ADA violations encountered by his then-

former clients in the local community. This completely free, no strings attached, offer to

provide notice of ADA issues in the community was rebuffed; the reality is that the

business community as a whole would rather not know about ADA violations (because then

they would have to pay to fix them) except when the ADA violations poses a credible risk of

precipitating a lawsuit which businesses will have to pay to defend/settle. This is

the reality that Hansmeier personally observed, notwithstanding any counternarrative by

the business community.

Hansmeier thus self-reported to Sandstone FCI in July 2019 with some

unfinished business. Hansmeier's vision for ADA compliance in Minnesota is for

businesses and public entities to make a good faith effort to comply with the ADA.

In the ideally rare instances when businesses fail to comply with the ADA,

-9-

people with disabilities should be able to report the issue to the business

owner and obtain timely remediation of the issue. And, when a business owner

ignores the problem, they should expect to be sued. This vision — i.e., a good faith

effort to proactively comply with the ADA, a fair opportunity to address issues that were

overlooked during the proactive process and a credible threat of suit for any business

or government entity that refuses to be part of this process — is consistent with and furthers

the letter and the spirit of the ADA.

Hansmeier has all of the people and resources neccessary to turn this

vision into a reality. He can readily recruit individuals with disabilities to serve

as "testers," given the significant pent-up frustration with the business community's

historic ADA apathy. While Hansmeier cannot represent the "testers" in court,

Hansmeier knows several attorneys who could provide quality representation. Finally,

Hansmeier has personal knowledge and experience with ADA barrier reporting technology

that anyone can use to report ADA issues — which will be an enormous asset

once the business community once again starts taking its obligations under the ADA

seriously. Hansmeier's specific plan is as follows: assemble a group of "testers" to enforce

the ADA until the business/local government communities are willing to implement credible

proactive ADA compliance plans; implement a barrier notification technology and persuade

the communities of business, government and people with disabilities to use the technology in

lieu of an immediate ADA lawsuit; and pursue strong enforcement efforts against

facilities that refuse to comply or make a good faith effort to comply with the ADA.

If implemented in an effective manner, Hansmeier's method would result in widespread

ADA compliance with a minimal number of lawsuits.

Hansmeier is not asking the Court to endorse his political vision. Rather,

Hansmeier is asking the Court to prevent Defendants from unlawfully using their

power to prosecute to interfere with Hansmeier's realization of his political vision.

Defendants' personal political disagreement with the "tester" method of

ADA enforcement is not a sufficient reason to allow them to use the

mail fraud, wire fraud and extortion statutes to deter litigation methods they

do not like. This is the United States of America, not the People's Republic of China;

the executive branch cannot tread on the rights of the people to advocate for

meaningful political reform.

## 2. Standing

Hansmeier has standing to seek relief with respect to his Constitutional

claims. "To have Article III standing, a plaintiff must have (1) suffered an injury in

fact, (2) that is fairly traceable to the challenged conduct of the defendant, and

(3) that is likely to be redressed by a favorable judicial decision." _Final Exit_

_Network, Inc. v. Ellison_, 370 F. Supp. 3d 995, 1009 (D. Minn. 2019).

Hansmeier has suffered an injury in fact due to the chill he has experienced

as a result of Defendants' efforts to deter him and others from helping people

with disabilities enforce their rights under the ADA. For purposes of Article III

standing, "[r]easonable chill exists when a plaintiff shows an intention to engage

in a course of conduct arguably affected with a constitutional interest, but

proscribed by statute, and there exists a credible threat of prosecution." Id.

Here, Hansmeier intends to pursue social change by encouraging people with disabilities

to pursue "tester" claims against businesses and public entities until these entities demonstrate

a credible intent to proactively comply with the ADA. Then, Hansmeier intends to persuade

all interested parties to embrace voluntary reporting/fixing of architectural barriers that

were in good faith missed during the proactive process and to pressure outliers to come

into the fold via the prospect of litigation and social media shaming. In addition,

Hansmeier anticipates engaging with the press and his elected representatives in response

to the business community's anticipated counter-attacks, which in the past included planting

"hit pieces" in the local media and lobbying for changes to state and federal accessibility

laws. The foregoing activities fall squarely within the scope of the First Amendment's

rights of speech and petitioning. These activities will come within the Defendants'

understanding of the mail fraud, wire fraud and extortion statutes. The Court may

take judicial notice of the government's characterization of the mail and wire fraud

statutes in its appellate briefing as being "measured by a nontechnical standard," and

extending to cover violations of "accepted moral standards" — whatever that may

mean. See Government Brief, No. 19-2386, United States v. Hansmeier (8th

Cir.), at 25. The government appears to embrace a similar scope of the extortion

statute. Id. at 8, 9, 20, 28, 34, 39, 43, 51, 61. Certainly, the government

is on records as indicating that "tester" ADA litigation constitutes a threat to

public safety. The government has threatened to criminally prosecute Hansmeier

for engaging in "tester" ADA enforcement. The government used Hansmeier's

involvement in ADA "tester" litigation to argue for an enhanced sentence in Hansmeier's

criminal case. Hansmeier thus faces a credible threat of criminal prosecution for

engaging in and encouraging "tester" ADA enforcement, which will be the

central source of leverage to effect a shift in attitudes regarding ADA

compliance.

-14-

The remaining elements of standing, i.e., causation and redressability are

not expected to be in dispute here. Defendants' actions are giving rise to the

chill Hansmeier is experiencing and a favorable order from the Court would

eliminate the chill.

3. Likelihood of success on the merits.

Defendants' threatened application of the mail fraud, wire fraud and

extortion statutes to Hansmeier for assisting people with disabilities enforce their

rights under the ADA via the "tester" enforcement method, violates the

Constitution for several reasons.

a. Hansmeier's position is consistent with the "overwhelming weight of authority."

Hansmeier's position is consistent with the "overwhelming weight of authority."

"The reality is that litigating parties often accuse each other of bad faith." United

States v. Pendergraft, 297 F.3d 1198, 1207 (11th Cir. 2002) (rejecting mail fraud and

extortion charges based on allegations of fraudulent litigation). Thus, the various circuit courts have had opportunity to review the application of the federal mail fraud, wire fraud and extortion statutes to allegations of fraudulent litigation — where these crimes serve as predicate acts supporting civil RICO claims. Although most of these decisions occurred in the civil context, it is a cardinal rule that courts must interpret statutes consistently across the criminal and noncriminal contexts. See Leocal v. Ashcroft, 543 U.S. 1, 12 n.8 (2008).

A survey of circuit court decisions indicates that apparently every federal appellate court to consider the issue has rejected the application of the mail fraud, wire fraud and extortion statutes to allegations of fraudulent litigation. See I.S. Joseph Co. v. J Lauritzen A/S, 751 F.2d 265, 267 (8th Cir. 1984) (holding that threat to sue, even if "groundless and made in bad faith," did not constitute extortion); Kim v. Kimm, 884 F.3d 98, 104 (2d Cir. 2018) (collecting cases from the First, Fifth, Tenth and Eleventh Circuits in concluding that

"allegations of frivolous, fraudulent or baseless litigation activities — without more — cannot constitute a RICO predicate act."); Vemco, Inc. v. Camardella, 23 F.3d 129, 134 (6th Cir. 1994)(threat of litigation "does not constitute extortion."); First Pac. Bancorp, Inc. v. Bro, 847 F.2d 542, 547 (9th Cir. 1988)(same). The foregoing circuit court decisions, when combined with district court decisions reaching the same result, comprise what one district recently described as the "overwhelming weight of authority" rejecting the application of the mail fraud, wire fraud and extortion statutes to litigation conduct. See Carroll v. United States Equities Corp., 2019 U.S. Dist. LEXIS 162631, at *35 (N.D.N.Y. Sept. 24, 2019).

The foregoing decisions arose in a wide variety of contexts, but consistently articulate similar justifications for rejecting the application of the mail fraud, wire fraud and extortion statutes to litigation conduct. First, courts reason that applying these statutes to litigation activity would impermissibly undermine access to the courts because any unsuccessful lawsuit could lead to drastic liability. Second, courts reason that

-17-

applying those statutes to litigation activity would impermissibly undermine the judicial

system by allowing every judgment to be relitigated in a subsequent proceeding involving

allegations of
fraud/extortion in the original proceeding. See Kim, 884 F.3d at 104.

The district court's decision in Neal v. Second Sole of Youngstown, Inc.,

No. 1:17-cv-1625, 2018 U.S. Dist. LEXIS 4031, at *5-10 (N.D. Ohio Jan.

9, 2018) is directly on point. In Neal, the plaintiff sued defendants alleging violations

of the ADA and its state law equivalent. Three of the defendants filed counterclaims

alleging, among other things, that the plaintiff conspired with his attorneys by

to extort money from businesses and individuals by bringing meritless claims

against them, thus violating the mail fraud and extortion statutes. The district court,

in a thorough and persuasive opinion, held that those allegations could not support mail

fraud or extortion claims and dismissed the claims pursuant to Federal Rule of Civil

Procedure 12(b)(6). The allegations raised by the Neal defendants may as well have

been written by the Defendants in this case given the overlap in the respective

-18-

defendants' theories/understandings of fraud and extortion in the ADA context. The Court

should apply Neal's reasoning in this case. Hansmeier is likely to succeed on the merits.

              b.  First Amendment.

       The government's application of the mail fraud, wire fraud and extortion

statutes to Hansmeier for assisting people with disabilities enforce their rights under

the ADA via the "tester method" unduly burdens Hansmeier's petitioning and speech rights.

The First Amendment's Petition Clause "protects the right of individuals to appeal

to courts and other forums established by the government for resolution of legal

disputes." Borough of Duryea v. Guarnieri, 564 U.S. 379, 387 (2011).

The government's use of the mail fraud, wire fraud and extortion statutes

to prevent Hansmeier from encouraging people to use the "tester" method

of ADA enforcement is a content-based restriction because it "cannot be

justified without reference to the content of the regulated speech." Reed

v. Town of Gilbert, 135 S. Ct. 2218, 2227 (2015). Content-

based speech restrictions are presumptively unconstitutional and are subject to strict scrutiny. Id. at 2226. The government's application of the mail fraud, wire fraud and extortion statutes to Hansmeier based on his encouraging and assisting with the "tester" ADA enforcement method is content-based irrespective of whether it is viewed through the prism of the Petition Clause or the Speech Clause. Strict scrutiny is warranted.

Strict scrutiny is warranted for the additional reason that the activity subject to Hansmeier's claims will go to the heart of political, social and other concerns to the community. See Snyder v. Phelps, 562 U.S. 443, 453 (2011) (noting that special protection extends to speech "relating to any matter of political, social, or other concern to the community....."). Hansmeier's prior efforts in ADA enforcement interwove with a fierce public and political debate at the state and national levels regarding ADA enforcement methods. In Minnesota, the Minnesota Human Rights Act was actually amended

-20-

in what one member of the Minnesota Legislature reportedly referred to tongue-

in-cheek as the "Hansmeier Bill." The government's threat to use the mail

fraud, wire fraud and extortion statutes to silence the figurehead of one

side of a fierce political debate should be strictly reviewed.

"To survive strict scrutiny . . . a statute must: (1) serve compelling government

interests; (2) be narrowly tailored to achieve that interest; and (3) be the least restrictive

means of advancing that interest." ACLU v. Mukasey, 534 F.3d 181, 190

(3d Cir. 2008) (citing Sable Commc'ns. of Cal. Inc. v. FCC, 492 U.S. 115

(1989)).

Compelling Interest. The government cannot identify a compelling interest in

applying the mail fraud, wire fraud and extortion statutes to Hansmeier's ADA enforcement

methods. Based on the nature of the statutes, the government's assertion of interest

is expected to be something along the lines of the interests articulated by the

defendants/counter-plaintiffs in Neal: deterring what the government

(incorrectly) believes to be meritless "tester" ADA enforcement claims which place

an undue pressure on the defendant to pay a nuisance settlement. As applied to

"tester" ADA enforcement claims, these concerns are illusory. As described in "Separation

of Powers," _infra_ at pp. ___ , the "tester" method of ADA enforcement gives rise

to meritorious ADA claims; if a defendant settles it is because the defendant was

violating the law. Moreover, by subjecting themselves to the judicial process,

"testers" vitiate any plausible concern of intent to "decieve" or to "extort." The

entire point of the judicial process is to eliminate those concerns. The adversary

system provides for broad court-supervised discovery into any matter that might be

relevant to a claim, which leaves the judicial process the antithesis of mail or wire

fraud. So too is subjecting oneself to the judicial process the antithesis of extortion.

In litigation, parties resolve their disputes under the watchful eye of a neutral judge

who holds broad power to check any litigation abuses. Indeed, Hansmeier is

serving his term of imprisonment with _actual_ extortionists. The government's

irresponsibility in attempting to draw an equivalency between people who voluntarily submit their disputes to the judicial process and people who go around and extract money from others at the point of a gun is difficult to overstate. See Pendergraft, 297 F.3d at 1206 ("History has taught us that, if people take the law into their own hands, an endless cycle of violence can erupt, and we therefore encourage people to take their problems to court."). Based on the foregoing, the government does not have a sufficiently compelling reason to apply the mail fraud, wire fraud, and extortion statutes to Hansmeier's "tester" ADA enforcement.

Narrowly Tailored/Least Restrictive Means. Even if the government had a sufficiently compelling interest in applying the mail fraud, wire fraud and extortion statutes to Hansmeier's "tester" ADA enforcement, such application is not narrowly tailored to achieve those interests. Moreover, such application would fail to satisfy the least restrictive means test because it "effectively suppresses a large amount of [constitutionally-protected] speech ... [when] less restrictive alternatives

alternatives will not be as effective as the challenged statute." _Ashcroft v. ACLU,_

542 U.S. 656, 665 (2004)(quoting _Reno v. ACLU,_ 521 U.S. 844, 874

(1997)). "[T]he burden is on the government to prove that the proposed alternatives

will not be as effective as the challenged statute." _Id._ That burden is "not merely

to show that a proposed less restrictive alternative has some flaws; its burden

is to show that it is less effective." _Id._ at 669. The government cannot satisfy

that burden.

As an initial matter, Hansmeier cannot imagine and the government will

be unable to show any deficiency in our legal system that could conceivably

justify the government's application of the mail fraud, wire fraud and extortion

statutes to litigation conduct. As the _Pendergraft_ court opined, "We trust the

courts, and their time-tested procedures to produce reliable results, separating validity

from invalidity, honesty from dishonesty. While our process is sometimes expensive, and

accassionally inaccurate, we have confidence in it." _Pendergraft,_ 297 F.3d at 1206.

-24-

Beyond that, if the government nevertheless believes that the legal system is incapable

of handling the "tester" ADA enforcement claims Hansmeier plans to encourage, the

government has every right to file a statement of interest in any "tester" case.

Through the statement of interest device, the government can raise any challenge

it pleases to "tester" enforcement. Finally, it should not be overlooked that Defendants

possess rulemaking authority with respect to the ADA, which Defendants could

use to address whatever issues they have with the "tester" ADA enforcement

method. There is simply no reason for Defendants to resort to the mail fraud,

wire fraud and extortion statutes to circumvent the democratic process and deter

the "tester" enforcement method.

For all of the reasons set forth above, the government's application of

the mail fraud, wire fraud and extortion statutes to Hansmeier's "tester" ADA

enforcement violates the First Amendment to the U.S. Constitution.

c.  Fifth Amendment.

The government's application of the mail fraud, wire fraud and extortion statutes to the "tester" ADA enforcement method violates Hansmeier's Fifth Amendment right to Due Process. "A law may be vague in violation of the Due Process clause for either one of two reasons: First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement." Act Now to Stop War + End Racism Coal. v. District of Columbia, 846 F.3d 391, 409 (D.C. Cir. 2016) (citing City of Chicago v. Morales, 527 U.S. 41, 56 (1999)).

As applied to Hansmeier's involvement with the "tester" ADA enforcement method, the mail fraud, wire fraud and extortion statutes do both. First, the application of these statutes to the "tester" ADA enforcement method fails to provide the kind of notice that will enable

-26-

ordinary people to understand what conduct they prohibit. An ordinary

person would believe that the "tester" ADA enforcement method results in a

colorable ADA claim, see, e.g., Nanni v. Aberdeen Marketplace, Inc., 878

F.3d 447, 457 (4th Cir. 2017), and that a person who encourages

others to bring valuable and colorable civil rights claims would not be subject to fraud

or extortion liability — even when local assistant U.S. attorneys disagree with the claims.

Indeed, in light of the "overwhelming weight of authority" rejecting the application of

the mail fraud, wire fraud and extortion statutes to litigation conduct, an ordinary person

would believe that those statutes have no application to their conduct whatsoever. An

ordinary person would understand that we have an adversary litigation system where

each party is responsible for advancing their position zealously — subject to

requirements of Federal Rule of Civil Procedure 11, the perjury statutes, 28 U.S.C.

§ 1927, and other laws that are specific to litigation conduct. While an

ordinary person would understand that violating a litigation-specific rule or

statute would result in the sanctions and/or penalties identified in the provision,

no ordinary person would expect to be prosecuted for fraud or extortion for

applying an ADA enforcement model that has been used successfully nationwide.

Beyond lack of notice, the mail fraud, wire fraud and extortion statutes, as

applied to the "tester" ADA enforcement method, authorize and even encourage

arbitrary and discriminatory treatment. The government's application of those statutes

to criminalize the "tester" ADA enforcement method cannot be justified by reference

to any objective standard, including (but not limited to): the plain texts of the mail

fraud, wire fraud or extortion statutes; the plain text of the Americans With Disabilities

Act; and case law interpreting those statutes. The complete untethering of the government's

use of the mail fraud, wire fraud and extortion statutes to criminalize established

methods of ADA enforcement from any objective standard invites the government to

use these statutes to deter through criminalization any litigation a given prosecutor

dislikes — which, of course, is precisely the sort of standardless environment the

-28-

Fifth Amendment prohibits.

    iii. Separation of powers.

The government's application of the mail fraud, wire fraud and extortion statutes to Hansmeier's participation with ADA "testers" is unconstitutional because it impermissibly disrupts the separation of powers among the three branches of the federal government. Pursuant to the doctrine of separated powers, the powers of government are separated among the three coordinate branches. The declared purpose of separating and dividing the powers of government was to "diffuse power the better to secure liberty." _Youngstown Sheet & Tube Co. v. Sawyer_, 343 U.S. 579, 635 (1952). The principle of separating powers into three separate branches is the central structural feature of the Constitution. The Federalist No. 47, at 324 (J. Cooke ed. 1961). Political scholars recognize the vital role that separating powers plays in securing liberty. _See_ Sir William Blackstone, Commentaries on the Laws of England, 146 (9th ed. 1783) ("In all tyrannical governments

the supreme magistracy, or the right of both making and enforcing the laws,

is vested in one and the same men, or one and the same body of men; and

wherever these two powers are united together, there can be no public liberty.").

Scholars focus in particular on the dependence of free societies on maintaining the

separation of power to _make_ the law from the power to _enforce_ the law. _See, e.g.,_

Edward Gibbon, _History of the Decline and Fall of the Roman Empire,_ 33 (1838)

("The principles of a free constitution are irrecoverably lost when the legislative power

is nominated by the executive.").

    The government's use of the mail fraud, wire fraud and extortion statutes

to criminalize the "tester" ADA enforcement method impermissibly interferes/

intrudes upon Congress's power to make the law, U.S. Const. Art. 1 § 1., and the

judiciary's power to interpret the law, U.S. Const. Art. III § 1. Apparently _every_

circuit court to consider the issue has interpreted the ADA as rejecting

challenges to "tester" standing in the ADA context. _See, e.g., Mosley v._

Kohl's Dep't Stores, Inc., 942 F.3d 752, 758-59 (6th Cir. 2019);

Nanni v. Aberdeen Marketplace, Inc., 878 F.3d 447, 457 (4th Cir. 2017);

and Houston v. Marod Supermarkets, Inc., 733 F.3d 1323, 1332-34 (11th

Cir. 2013). The typical challenge raised by a defendant in a "tester" ADA case

is that the plaintiff lacks standing to bring ADA claims because they are not

bona fide patrons. The circuit courts to consider the issue have noted that the

barrier removal provisions of the ADA, unlike other provisions of the ADA, does

not contain a "bona fide patron" requirement and that "testers" have every right to

bring discrimination claims. See id.

Thus, the ADA, as written by Congress and interpreted by the courts

authorizes "testers" to bring claims alleging discriminatory architectural barriers. The

government's use of the mail fraud, wire fraud and extortion statutes to criminalize

claims that are colorable under the ADA essentially neuters Congress's power to make

the law and the judiciary's power to interpret the law. After all, the prospect of

-31-

a "win" in court would seem like a hollow victory indeed if it was followed up

by a criminal prosecution and a lengthy term of imprisonment; the government's ability

to prosecute under such circumstances, if left unchecked by this Court, would allow

the executive to impermissibly dominate the legislative and judicial branches, if not

render them irrelevant.

### 4. Irreparable harm.

Hansmeier will suffer imminent and irreparable harm absent a preliminary

injunction. Standing alone, Defendants' violation of Hansmeier's First Amendment

rights "unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S.

347, 373 (1976). The "loss of First Amendment freedoms, for even minimal

periods of time, unquestionably constitutes irreparable injury for the purposes

of the issuance of a preliminary injunction." Id. "Where a plaintiff alleges

injury from a rule or regulation that directly limits speech, the irreparable

nature of the harm may be presumed." Bronx Households of Faith v. Bd.

of Educ. of City of N.Y., 331 F. 3d 342, 349 (2d Cir. 2003). On these

grounds alone, Hansmeier establishes the requisite harm.

The government's use of the mail fraud, wire fraud and extortion

statutes to silence its political adversary (without any good faith basis for

doing so) is precisely the form of irreparable harm that a preliminary injunction is

designed to cure.

5. Balance of equities/public interest.

Since this case involves the government, the balance-of-equities factor

merges with the fourth factor, public interest. Nken v. Holder, 556 U.S. 418,

435 (2009). When considering the competing claims of injury and the effect on

each party of the granting or withholding of the requested relief, the balance

strongly favors Hansmeier.

The government will suffer no harm from Hansmeier's requested relief, i.e.,

a preliminary injunction against the government's application of the mail fraud,

-33-

wire fraud and extortion statutes to Hansmeier's involvement with ADA "tester"

enforcement. All that this will entail is Hansmeier encouraging and assisting people

with disabilities enforce their rights under the ADA with an aim towards putting

pressure on all relevant stakeholders to participate in an effective reporting system.

If this will prejudice anyone, it will only be those businesses which are violating

the ADA. The government, by the way, has every opportunity to be heard in this

process by filing a statement of interest in the anticipated actions. In the alternative,

the government could obviate the entire process by enforcing the ADA itself.

The public will benefit greatly from the entry of a preliminary

injunction. The public interest favors effective civil rights enforcement,

compliance with the law, and open access to the courts.

For all of the foregoing reasons, the Court should enter a

preliminary injunction with respect to Hansmeier's Constitutional

claims.

-34-

B. The Court should enter a preliminary injunction with respect to
Hansmeier's participation clause claims.

The Court should preliminarily enjoin Defendants from retaliating against

Hansmeier on account of his having assisted people with disabilities with enforcing

their rights under the ADA. In this motion, for the reasons set forth

below, the Court should order Defendants to transfer Hansmeier to home

confinement during the pendancy of the appeal in his criminal matter and

preliminarily enjoin Defendants from continuing to retaliate against Hansmeier.

(Intentionally left blank)

I.  Background.

In late-2016, Defendants charged Hansmeier with mail and wire fraud based on allegations that Hansmeier filed frivolous copyright enforcement claims. These charges had nothing to do with Hansmeier's representation of people with disabilities in enforcing their rights under the ADA, but the government repeatedly used Hansmeier's ADA representation against him. The example that is relevant to this motion is Hansmeier's renewed motion for release pending appeal.

Hansmeier defended against the government's criminal charges by moving to dismiss the indictment. Hansmeier's motion to dismiss failed and Hansmeier entered into a conditional plea agreement which preserved his right to appeal. Hansmeier's appeal is pending and Hansmeier expects a decision to be issued by the Eighth Circuit in March or April 2021, as oral argument has not yet been heard or calendared. Hansmeier, at sentencing, presented a motion requesting the relief of being granted release pending appeal pursuant to 18 U.S.C. § 3143 (which is

-36-

fairly regularly granted in cases, such as Hansmeier's, involving novel theories of

mail fraud). The motion was denied and Hansmeier self-reported to Sandstone FCI in

July 2019. In March 2020, in light of the COVID-19 outbreak in federal prisons

and recent decisions which pulled the rug out from underneath the government's theories

of fraud, Hansmeier moved the district court for release pending appeal via a renewed

motion for release pending appeal. The government opposed Hansmeier's motion and

the district court denied it without prejudice on the grounds that the motion should

have been filed through counsel. If that was all there was to the story, then

there would be no problem.

The "more" is that the government opposed Hansmeier's renewed motion in part

on the grounds that, according to the government, Hansmeier was a threat to public

safety based on his representation of people with disabilities — which the government's

response outrageously and cruelly alluded to as "trolls." In this motion,

all that Hansmeier is asking for is for the government to present any

real reason they have to oppose Hansmeier's transfer to home confinement

pending appeal. Hansmeier was released on signature bond from the time

of his arrest in late-2016 to his self-reporting to Sandstone FCI in July

2019. At Sandstone, Hansmeier has lived incident free while serving as a

GED tutor. Now, in light of COVID-19, inmates are confined to their units

virtually all the time with no meaningful opportunity for exercise, fresh air

and access to education and religious services. In light of those circumstances,

Hansmeier cannot understand what problem the government could possibly have

with Hansmeier's transfer to home confinement while his appeal is pending.

If transferred to home confinement, Hansmeier would continue to live

incident free and would self-report to Sandstone if ever ordered to do so

by the Court.

    2.  Argument.

Hansmeier readily satisfies all of the requirements for a preliminary

injunction.

First, Hansmeier can show a strong likelihood of success on the merits.

The ADA's participation clause prohibits the government from retaliating

against Hansmeier on account of Hansmeier having assisted people with disabilities

enforce their rights under the ADA. 42 U.S.C. § 12203. To prevail in

his claim, Hansmeier will first have to show the he engaged in a protected

activity, that the government took an adverse action against him, and that

there was a causal connection between the adverse action and the protected activity.

Then, the burden shifts to the government to show that there is a legitimate

non-illegal reason for its action. If the government meets its burden (which

it cannot do here), then Hansmeier would have to show that the government's

proffered reason was pretextual. See  Hustvet v. Allina Health Sys., 910

F.3d 399, 412 (8th Cir. 2018).

Here, the government used Hansmeier's history as an attorney for

people with disabilities as a basis for arguing that Hansmeier is a threat

to public safety and therefore should not be released pending appeal. This

frankly ridiculous conduct satisfies the elements of Hansmeier's prima facie

showing. The government will not be able to demonstrate any legitimate basis

for this argument and that will be the end of the argument/analysis. This is

not, by any means, a difficult case where the Court has to infer the government's

state of mind from a series of ambiguous actions.

Second, Hansmeier can make a strong showing of irreparable harm in

the absence of the requested preliminary injunction. Sandstone FCI just reported

its first confirmed case of COVID-19. Were he to contract COVID-19,

Hansmeier would not have access to high quality medical care in the event

he developed complications. Beyond the very real COVID-19 risk, Hansmeier

does not have meaningful access to exercise and has not been able to see

his family since the Bureau of Prisons entered modified operations in March

in March 2020. This is time with his wife and his kids which

Hansmeier will never be able to get back.

Third, the balance of equities/public interest weighs heavily in Hansmeier's

favor. Certainly, the public cannot suffer any harm by having Hansmeier sit quietly

at home while his appeal is pending. The public would benefit from action by

the Court as a signal of judicial disapproval of the government's retaliation

against civil rights attorneys who help enforce the ADA. The ADA is

a fundamentally decent and humane law that helps people who require the

use of mobility devices have a meaningful life.

Remedy. Hansmeier requests that the Court order Defendants

transfer Hansmeier to home confinement pending the resolution of his

appeal and to preliminarily enjoin Defendants from retaliating against Hansmeier

on account of his having assisted people with disabilities enforce their rights

under the ADA.

## III. Conclusion.

The Court should grant Hansmeier's motion for a preliminary injunction.

July 9, 2020                          Respectfully submitted,

                                      Paul Hansmeier
                                      20953-041 Unit K3
                                      Federal Correctional Institution
                                      P.O. Box 1000
                                      Sandstone, MN 55072